IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>1. AHMED ABDUL RAZAQ AL OBAIDI, and<br><br>2. MUHAMMAD ABDULLAH KAHN, a/k/a "MAK", a/k/a "Mack" | Case No. 26-mj-783 (DJF) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, John Woolley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit[1] in support of a criminal complaint and arrest warrant concerning violations of 7 U.S.C. § 2024(b), relating to the unlawful acquisition, possession, use, transfer, or trafficking of Supplemental Nutrition Assistance Program (SNAP) benefits.

2. I am a Special Agent employed by the United States Department of Agriculture, Office of Inspector General, and have been so employed Since 2026. I am a federal law enforcement officer authorized to investigate

[1] This affidavit is substantially similar to that in 26-mj-325-DTS signed on April 6, 2026, which was an affidavit in support of a search warrant of a premises. One good-faith inaccuracy is noted below in in paragraph 28, note 2.

violations of federal law, execute search and arrest warrants, and make arrests.

3. As part of my duties as a USDA-OIG Special Agent, I conduct investigations involving Supplemental Nutrition Assistance Program fraud; Women, Infants, and Children fraud; access device fraud; wire fraud; and other financial crimes. I am currently the Special Agent in Charge of the Midwest region of the USDA-OIG. I have been in this position since July 2026. Before joining USDA-OIG, I served as a Special Agent with the U.S. Department of Education Office of the Inspector General. Before entering federal service, I served as an infantry soldier in the United States Army. As a USDA-OIG Special Agent, I have led or participated in investigations involving misdemeanor and felony offenses, including fraud, financial crimes, and controlled substances.

4. This affidavit is based on my personal knowledge and on information obtained from documents, electronic databases, witnesses, and other law enforcement agents involved in this investigation. It is submitted for the limited purpose of establishing probable cause for the criminal complaint and arrest warrant and therefore does not include every fact known to me or other investigators.

5. In light of the information described below, I submit that there is probable cause to believe that Ahmed Abdul Razaq AL OBAIDI (AL OBAIDI) and Muhammad Abdullah KAHN (KAHN) committed the following offenses:

- SNAP fraud, in violation of 7 U.S.C. § 2024;

## THE CHARGED OFFENSES

6. Title 7 United States Code, Section 2024(b) states, in relevant part, "whoever knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter shall, …if the item used, transferred, acquired, altered, or possessed is a benefit that has a value of $100 or more, but less than $5,000, be guilty of a felony and shall, upon the first conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both."

## THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM

7. The Supplemental Nutrition Assistance Program, formerly known as the Food Stamp Program (FSP), is a federally funded national nutrition aid program administered by the United States Department of Agriculture (USDA) through its Food and Nutrition Service (FNS). SNAP is a "means tested" entitlement program intended to alleviate hunger and malnutrition while strengthening the nation's agriculture economy. SNAP does this by providing nutrition assistance to eligible, low-income individuals and households via a monthly benefit.

8. Between 1939 and 2001, FSP beneficiaries were issued paper coupons as a way to acquire low, or no cost, food for themselves and families. In 2001, the FSP transitioned from the paper coupon system to the current Electronic Benefit Transfer (EBT) system of access devices to distribute benefits. These EBT cards are similar to commercial debit cards.

9. Since the passage of the Food Stamp Act of 1964, (7 U.S.C. §§ 2001 *et* seq.), the responsibility for the day-to-day administration of the SNAP Program was delegated to individual states. In Minnesota, the Minnesota Department of Health and Human Services (MDHHS) is tasked with administering the program.

10. Each month, SNAP benefits are directly deposited into authorized recipients' EBT card accounts to subsidize food purchases at supermarkets, convenience stores, and other food retailers, including farmers' markets.

11. With the passage of the 2008 Farm Bill, the FSP program was formally replaced by SNAP.

12. Pursuant to the provisions of the Food and Nutrition Act of 2008, SNAP recipients are only permitted to exchange their SNAP benefits for specific "eligible food items" for home consumption. SNAP benefits cannot be exchanged, redeemed, or bartered for cash, alcoholic beverages, tobacco, controlled substances, vitamins, medicine, pet food, cleaning products, or any other non-food items. Additionally, SNAP benefits may be used only by the

household to which they have been designated, or other persons that the household selects. SNAP transactions are electronically completed via EBT processing equipment commonly referred to as Point of Sale (POS) devices.

13. POS devices permit authorized retailers to communicate with U.S. Government contractors who operate central computer databases that automatically debit SNAP recipients' EBT card balances at the time of a food purchase and electronically remit corresponding reimbursements to vendors.

14. To participate in SNAP in Minnesota, the owner of a retail food store is required to complete, sign, and submit to the USDA-FNS a Food Stamp Program Application for Stores (Form FNS-252). The application contains a certification, signed by the store owner, that states that violations of SNAP regulations can lead to criminal prosecution and sets forth as examples of such violations, "[t]rading cash for food stamp benefits," "[a]ccepting food stamp benefits as payment for ineligible items," and "[a]ccepting food stamp benefits as payment on credit accounts or loans." Earlier versions of Form FNS-252 contained the same warnings in slightly different language.

**THE ISSUANCE, USE, AND REDEMPTION OF SNAP BENEFITS**

15. Through a third-party processor, the USDA-FNS provides retail food stores that it has approved to participate in SNAP with electronic terminals known as POS terminals, which are placed near cash registers at store check-out areas.

16. The Minnesota Department of Human Services (MNDHS) provides eligible food stamp beneficiaries with EBT cards, commonly referred to in Minnesota as "SNAP" or "EBT" cards. The MNDHS also provides SNAP beneficiaries with personal identification numbers (PINs), which are to be used with the EBT cards.

17. The MNDHS issues a specific monthly dollar amount of SNAP benefits to beneficiaries. These SNAP benefits are "loaded onto" the EBT cards, stored in a central computer database, and electronically accessed through the use of EBT cards and PINs at store POS terminals.

18. The purchase of eligible food items with SNAP benefits is accomplished in the following manner: (a) the beneficiary selects eligible food items at an authorized retail food store; (b) he or she goes to the checkout lane; his or her EBT card is swiped through the POS terminal, which reads the magnetic strip on the back of the EBT card; he or she enters his or her PIN into the POS terminal; (c) the POS terminal communicates electronically with a central computer database located outside of the State of Minnesota; (d) the central computer database then electronically informs the POS terminal that the purchase is either approved or disapproved based on the current balance of SNAP benefits in the beneficiary's account; (e) if the purchase is approved, the beneficiary leaves the store with his or her groceries and the central computer database deducts the purchase price from the beneficiary's SNAP

account balance and credits the corresponding amount to the retail food store's designated bank account; and (f) at least once a day, the central computer database adds up the credits to the retail food store's account, and the U.S. Treasury transfers the total amount by wire to the designated bank account of the retail food store.

19. Stores in Minnesota are electronically reimbursed for SNAP purchases through a secure, automated process involving EBT card swipes, usually processed within 1-2 business days. Retailers use authorized POS systems to validate transactions, which then trigger automatic funds transfers from federal, state-managed accounts. Retailers in Minnesota are reimbursed for SNAP transactions through payment processors that connect to the state's EBT system.

20. EBT cards are like credit or debit cards, and in the case of SNAP, the EBT card is linked to the recipient's benefit account and credited with the beneficiary's allocated benefit amount on a monthly basis. The recipient can redeem benefits at participating retailers. Redemption is done in a fashion similar to a credit card transaction, either by manually entering the account information or by swiping the EBT card into or through the POS device. The SNAP recipient then enters a PIN in the machine's external PIN pad to complete the transaction. The EBT card machine records the EBT card

number, the date and time of the transaction and the amount debited from the recipient's EBT account.

21. Once the necessary information is received by the POS device, it automatically communicates via a telephone line or internet connection with the eFunds computer system / servers located in New Berlin, Wisconsin. The government contracts with eFunds as the processor for SNAP transactions. The EBT card transaction is either approved or rejected by making several checks against the account and transaction (correct card number, active account, correct PIN, sufficient balance, and authorized retail number), and the result is then communicated to the POS device, again via the open phone line or internet connection. If the EBT card transaction is approved, eFunds transfers or causes to be transferred funds from the recipient's benefit amount into the bank account of the authorized retailer to whom the POS device was registered. This happens through a series of transactions; eFunds sends a batch electronic file (the Automated Clearinghouse (ACH) file) for all the transactions that occurred during the retailer's business day to Wells Fargo Bank in Minnesota, and Wells Fargo communicates with the SNAP U.S. Treasury Account located in Richmond, VA, to release funds in the total amount of the ACH file. These funds are ultimately routed to the retailer's bank account in the state in which the store owner operator has their bank account established. According to AK Tobacco's FNS 252 application their

business account is through Wells Fargo, 12120 Aberdeen St NE, Blaine, Minnesota 55449.

- Authorized stores use a POS device that reads the customer's EBT card to instantly authorize the transaction and confirm funds are available.
- Once a transaction is completed, the data is transmitted to the state's contracted, secure vendor. Fidelity Information Services (FIS) is the primary contracted service provider for Minnesota's SNAP EBT system.
- The state, in conjunction with the MNDHS, then authorizes payment for the specific, eligible items purchased.
- Funds are typically deposited electronically into the retailer's designated bank account, usually on a daily, weekly, or bi-weekly basis, depending on the retailer's setup with their payment processor.
- Retailers must be authorized by the USDA Food and Nutrition Service and use authorized equipment to accept SNAP benefits.

## AK TOBACCO, LLC




22. AK Tobacco is a tobacco retail shop and convenience store located at 466 Robert Street South, St. Paul, MN. AK Tobacco was incorporated in the State of Minnesota in July 2024. The Minnesota Secretary of State does not identify a registered agent on their website. AK Tobacco is listed with Employee Identification Number (EIN) [redacted]. The manager associated with this filing is AHMED AL OBAIDI, with an address of [redacted].

23. On about September 13, 2024, Ahmed Abdul Razaq AL OBAIDI applied to USDA-FNS for authorization to accept SNAP benefits at AK Tobacco, LLC, 466 Robert Street South, St. Paul, Minnesota. On page 6 of the

application, Ahmed Abdul Razaq AL OBAIDI accepted responsibility on behalf of the firm for any violations of SNAP, including:

- trading cash for SNAP benefits (i.e. trafficking);
- accepting SNAP benefits as payment for ineligible items;
- accepting SNAP benefits as payment on credit accounts or loans; and
- knowingly accepting SNAP benefits from people not authorized to use them.

24. Between the dates of September 11, 2024, and October 22, 2024, USDA-FNS personnel conducted a series of authorizations related to AK Tobacco's application to participate in the SNAP program. On the store review consent form, the name and signature appear to bear the name of Ahmed AL OBAIDI, listed as the owner.

25. On October 22, 2024, USDA-FNS authorized AK Tobacco to accept SNAP benefits from its customers.

## PROBABLE CAUSE

26. In February 2026, HSI and USDA-OIG conducted a joint investigation to identify businesses engaged in the unlawful use and trafficking of SNAP benefits. The investigation identified AK Tobacco, LLC, located at 466 Robert Street South, St. Paul, Minnesota, as a location where SNAP benefits were exchanged for cash.

27. Minnesota business records identified AL OBAIDI as the manager of AK Tobacco, LLC. Investigators also identified Muhammad Abdullah KAHN, also known as "MAK" or "Mack," as a clerk associated with the store who had, at various times, been employed at the store.

28. On February 20, 2026, a USDA-OIG confidential human source (CHS) met with KAHN at AK Tobacco. During the CHS's interaction with KAHN[2], KAHN agreed to charge approximately $600 in SNAP benefits from an investigative EBT card in exchange for approximately $300 in cash and instructed the CHS to return the next day.

29. On February 21, 2026, at approximately 11:14 a.m., the CHS returned to AK Tobacco. The CHS was wearing a device that captured video and audio of his interaction at AK Tobacco. Inside the store, KAHN was behind the cash register. A still image of the CHS's video is depicted below:[3]

[2] In the affidavit in support of a search of a premises (AK Tobacco) in 26-mj-325-DTS signed on April 6, 2026, paragraph 29 of that affidavit accurately describes the February 20, 2026 interaction between the CHS and the clerk who identifies himself as "Mak" and who was later positively identified as KAHN. However, the photograph of the individual that is placed below paragraph 29 is actually a photograph of AL OBAIDI and *not* KAHN. It appears that the placement of this picture of AL OBAIDI below paragraph 29 was a good-faith mistake.

[3] This photo is consistent with other known photos of KAHN.



30. The CHS indicated to KAHN that he desired to receive cash in exchange for SNAP benefits and referenced their apparent conversation the day prior at AK Tobacco. KAHN responded affirmatively and told the CHS to return in 30 minutes. KAHN then stated, "I called the guy, the guy's coming, he's going to take like 30 minutes," or words to that effect. KAHN then requested that the CHS provide to KAHN the CHS's phone number, the CHS provided a phone number, and KAHN appeared to enter the phone number in KAHN's cell phone. KAHN indicated to the CHS that he would call the CHS when he should return to the store.

31. On February 21, 2026, at approximately 11:57 a.m.[4], the CHS returned to AK Tobacco after previously receiving a phone call from KAHN in

[4] In the surveillance video of the CHS's interaction at AK Tobacco, the video begins with what sounds like a law enforcement agent reciting the date and time of the video. The agent states that it is February 21, 2026 and that the time was 11:57 p.m. Given the context that the CHS was told to return back to the store in about 30 mins, and the fact that the video is, from the appearance of the sky, obviously taken during the day, the agent appears to have made a mistake regarding the time being 11:57 "p.m.", and that the actual time was approximately 11:57 "a.m."

which KAHN informed the CHS that the CHS should return to the store. The CHS entered AK Tobacco, approached KAHN, who was behind the cash register. KAHN asked the CHS, "how much do you want to get?" or words to that effect. The CHS indicated to KAHN that he wanted $300. A still image of the CHS's video is depicted below:



32. KAHN then turned around and informed AL OBAIDI, who was also behind the cash register counter, that the CHS wanted to receive $600.



33. The CHS responded to both KAHN and AL OBAIDI, "yeah, yeah, yeah." AL OBAIDI responded, "okay", and then asked the CHS for the CHS's PIN number (in an apparent reference to his EBT card PIN number). AL OBAIDI instructed the CHS to swipe the CHS's EBT card in order to verify the balance on the card:



34. AL OBAIDI instructed the CHS to leave the CHS's EBT card at AK Tobacco, and that he could retrieve the card back sometime the next morning. The CHS asked AL OBAIDI if the CHS could receive $100 in cash immediately. AL OBAIDI replied yes and appeared to give cash to the CHS. The CHS was informed by either AL OBAIDI or KAHN[5] that the CHS would be called when the EBT card was ready to be retrieved. AL OBAIDI then informed the CHS that the EBT card could potentially be ready for pick-up that same day, and AL OBAIDI asked KAHN if KAHN had the CHS's phone number. KAHN replied that he did have the CHS's phone number. The CHS was given the indication that the remaining $200 would be provided to him

[5] The audio of the surveillance video is unclear as to if the person informing the CHS that he would be called when the card was ready was AL OBAIDI or KAHN, but the audio and context makes it clear that it was one of them.

whenever the CHS returned to AK Tobacco to retrieve the CHS's EBT card. The CHS left his EBT card at AK Tobacco.

35. On February 22, 2026, at approximately 11:02 a.m., the CHS returned to AK Tobacco. Upon entering the store, KAHN indicated to the CHS that the EBT card was not back yet, and informed the CHS that as soon as the EBT card was ready to be picked up, that KAHN would give the CHS a call. The CHS informed KAHN that the CHS would have another individual on the CHS's behalf pick-up the card at a later date or time.

36. On February 22, 2026, a $668.02 transaction posted to the investigative EBT account at Sam's Club store 6309, located at 1850 Buerkle Road, White Bear Lake, Minnesota.

37. Investigators reviewed Sam's Club surveillance video associated with the transaction. The surveillance video showed an individual who appears to be AL OBAIDI and another AK Tobacco clerk[6] associated with the transaction:

[6] This clerk appears to be an individual other than KAHN.





38. On February 24, 2026, an undercover agent entered AK Tobacco, and received $200 in cash and the investigative EBT card. Combined with the $100 previously provided, investigators received $300 in cash after $668.02 in benefits had been spent at Sam's Club.

39. Investigators reviewed video recordings made during the February undercover contacts at AK Tobacco. The video recordings corroborated the CHS's account that store personnel discussed providing cash in exchange for SNAP benefits, accepted and retained the investigative EBT card and PIN, advised when the card and remaining cash would be available, and ultimately returned the card and a total of $300 in cash. The video recordings did not depict every part of the transaction, but their timing and content were

consistent with the investigative EBT records, surveillance evidence, and accounts of the participating CHS and agents.

40. Investigators also reviewed photographs documenting evidence recovered during the operation. The photographs showed retail food and beverage items obtained during an investigative purchase, United States currency associated with the February 21 contact, and the investigative Minnesota EBT card displayed with $200 in currency after the February 24 recovery. Additional photographs documented identifying features of the recovered EBT card. These photographs were consistent with the operational records and the participating agents' accounts of the purchases, cash payments, retention of the card, and its later recovery.

41. Investigators also reviewed screenshots of messages with a contact displayed as "Maybe: MAK" in which the participants discussed a prior "hook up," another person with "stamps," an amount of $40 to $60, and doing a similar transaction later. The screenshot did not display the contact's telephone number or independently establish the legal identity of the participant, but its content was consistent with the CHS's account and the other evidence gathered during the investigation to the extent that AK Tobacco was unlawfully exchanging SNAP benefits for cash.

42. On March 20 and March 21, 2026, an HSI special agent conducting physical surveillance observed KAHN outside AK Tobacco, corroborating his continued association with the location.

43. USDA-FNS ALERT analysis identified 314 AK Tobacco SNAP transactions flagged under Scan F, totaling $17,050.75. Scan F flags each purchase transaction at a convenience store or small grocery store that exceeds the national 85th percentile by more than $20. Investigators considered those transactions together with AK Tobacco's average SNAP transaction amount, the number of affected households, the range of flagged transactions, average monthly redemptions, comparisons with similar stores, and changes in eligible food sales. Based on that analysis and the investigative evidence described above, USDA calculated a loss of approximately $17,050.75. Based on that analysis and the investigative evidence described above, USDA calculated a loss of at least $100.00, but less than $5,000.00, regarding the charged conduct between on or about February 20, 2026 and on or about February 24, 2026.

44. The timing of the cash exchange, transfer of the investigative EBT card and PIN, $668.02 Sam's Club charge, surveillance evidence, contemporaneous undercover recordings, photographic evidence, and the return of the card establish probable cause that AL OBAIDI knowingly used trafficked SNAP benefits and aided and abetted KAHN and others to carry out the offense.

45. KAHN's agreement on the exchange rate, receipt and retention of the investigative EBT card and PIN, coordination with other individuals, the contemporaneous undercover recordings and photographic evidence, and return of the card and remaining cash after the SNAP benefits were spent establish probable cause that he trafficked in benefits and aided and abetted AL OBAIDI and others to carry out the offense.

## CONCLUSION

46. Based on the foregoing, there is probable cause to believe that Ahmed Abdul Razaq AL OBAIDI and Muhammad Abdullah KAHN violated 7 U.S.C. § 2024(b). I respectfully request that the Court issue a criminal complaint and arrest warrant.

John F. Woolley

**John Woolley**
Special Agent in Charge, United States Department of Agriculture
Office of Inspector General

SUBSCRIBED and SWORN before me by reliable electronic means via ZOOM and email pursuant to Fed R. Crim. P. 41(d)(3) on October 20, 2026.

Dulce Foster

The Honorable Dulce J. Foster
United States Magistrate Judge